# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN SOLAK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | CLASS ACTION |
| v. | ) ) | |
| THE FRESH MARKET, INC., POMEGRANATE HOLDINGS, INC., POMEGRANATE MERGER SUB, INC., APOLLO GLOBAL MANAGEMENT, LLC, APOLLO MANAGEMENT VIII, L.P., RAY BERRY, RICK ANICETTI, MICHAEL CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT SHEARER, MICHAEL TUCCI, STEVEN TANGER, JANE THOMPSON, and BRETT BERRY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTION 14(D)(7) AND (E) OF THE SECURITIES EXCHANGE ACT OF 1934 AND U.S. SECURITIES AND EXCHANGE COMMISSION RULE 14D-10, AND FOR BREACH OF FIDUCIARY DUTY

Plaintiff John Solak ("Plaintiff"), individually and on behalf of all others similarly situated, by counsel, alleges upon information and belief, except for Plaintiff's own acts which are alleged on knowledge, the following based upon a continuing investigation conducted by and through their undersigned counsel and his retained expert consultant into the facts and circumstances alleged herein, including, without limitation, review and analyses of: (i) the public filings of The Fresh Market, Inc. ("Fresh Market" or the "Company") and Apollo (as defined herein) with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases, public statements, analyst reports, news articles, and other publications disseminated by or concerning Fresh Market, Apollo,

their respective related entities, and the Proposed Acquisition (as defined herein); and (iii) the corporate websites of Fresh Market and Apollo.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of himself and other public stockholders of Fresh Market against: (i) Fresh Market, its Board of Directors (the "Board" or "Individual Defendants"), Pomegranate Holdings, Inc., a Delaware corporation ("Parent"), its wholly-owned subsidiary Pomegranate Merger Sub, Inc., a Delaware corporation ("Merger Sub"), Apollo Global Management, LLC ("Apollo Global") and Apollo Management VIII, L.P. ("Management VIII" and with Parent, Merger Sub, and Apollo Global, "Apollo") for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty; (ii) Fresh Market, the Individual Defendants, Apollo, and the Rollover Defendants (as defined herein) for violations of section 14(d)(7) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14d-10 promulgated thereunder for differential consideration to be received by the Rollover Defendants from the proposed acquisition of Fresh Market by Apollo; and (iii) violations of section 14(e) of the Exchange Act against the Individual Defendants and Fresh Market in connection with the Solicitation/Recommendation Statement on Schedule 14D-9 filed with the SEC on April 13, 2012 (the "14D-9").  This action arises out of Apollo's efforts to purchase the outstanding common stock of Fresh Market (the "Proposed Acquisition") for $28.50 per share via a tender offer (the "Tender Offer").

2.      Founded by defendant Ray Berry ("R. Berry") in 1982, Fresh Market operates as a specialty grocery retailer in the United States.  As of March 14, 2016, the Company operates 186 stores in twenty-seven states across the U.S.

3.      On March 14, 2016, Fresh Market and Apollo announced a definitive merger agreement (the "Merger Agreement") under which Fresh Market would be acquired by Apollo via the Tender Offer.

4.      The Tender Offer is being made pursuant to the Merger Agreement, and was launched by Merger Sub on March 25, 2016, to purchase all of Fresh Market's shares for $28.50 in cash per share (except those shares described below) and then take the Company private by merging Merger Sub with and into the Company, with the Company surviving as a wholly owned subsidiary of Parent.  The Tender Offer will expire on April 21, 2016.  Following the completion of the Tender Offer, Fresh Market will be a wholly owned subsidiary of Parent.

5.      As alleged herein, Apollo has promised different and increased consideration to certain Fresh Market insiders—the Rollover Defendants—in violation of section 14(d)(7) of the Exchange Act and SEC Rule 14d-10 promulgated thereunder.  The Rollover Defendants have entered into Rollover and Support Agreements with Apollo, pursuant to which the Rollover Defendants have agreed not to tender their shares but to otherwise support the Proposed Acquisition.  In return, the Rollover Defendants have been given the special benefit of rolling over the vast majority of their Fresh Market shares for indirect ownership equity in Parent that will own Fresh Market as a result of the merger.  The rollover will allow the Rollover Defendants to benefit as Fresh Market flourishes under Apollo, while the Company's public stockholders will be deprived of their Fresh Market equity and that special benefit in return for the inadequate and unfair price of $28.50 per share.

6.      In addition to the Rollover Defendants, the Proposed Acquisition is being driven by the Board and members of management to secure material benefits for themselves as a result of the Proposed Acquisition, including the accelerated vesting and monetization of illiquid equity

holdings in the Company and change-of-control severance payments, which will provide over $31 million in gains to the Board and members of Fresh Market's management.

7.      The Board also retained a conflicted financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), which, among other things, has received **_over $116.7 million in fees from Apollo in the last two years alone_**.

8.      The Rollover and Support Agreements, together with a host of other preclusive deal protection devices defendants have agreed to as part of the Merger Agreement, make the Proposed Acquisition a _fait accompli_, including: (i) a "no-solicitation" provision; (ii) an illusory "fiduciary out" provision; (iii) an "information rights" provision; (iv) a "matching rights" provision; and (v) a $34 million "termination fee" provision.

9.      As described below, the 14D-9 contains material omissions and/or misstatements in contravention of section 14(e) of the Exchange Act and/or defendants' fiduciary duty of disclosure under state law, including material omissions and/or misstatements concerning the sales process leading up to the execution of the Merger Agreement, the potential and/or actual conflicts of interest present in the process leading to the Proposed Acquisition, the Company's inherent value, and the fairness analyses performed by the Company's financial advisor, J.P. Morgan. Without this material information, Fresh Market stockholders are prevented from making a fully-informed decision as to the adequacy of the Tender Offer and whether to tender their shares.

10.     In essence, the Proposed Acquisition is the product of a hopelessly flawed process that was designed to ensure the merger of Fresh Market with Apollo on terms preferential to Apollo and defendants, and detrimental to Plaintiff and Fresh Market's stockholders.  In agreeing to the Proposed Acquisition, each of the defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith, and fair dealing, and/or has aided and abetted such

breaches. By providing the Rollover Defendants with differential consideration, defendants are violating section 14(d)(7) of the Exchange Act. In disseminating a materially false and misleading 14D-9, the Individual Defendants and Fresh Market are violating section 14(e) of the Exchange Act.

11. Defendants are moving quickly to consummate the Proposed Acquisition. ***According to the defendants, the Tender Offer will expire on April 21, 2016***. Moreover, the deal protection devices operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Fresh Market. Consequently, immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

12. Plaintiff seeks to enjoin the Proposed Acquisition.

## JURISDICTION AND VENUE

13. Plaintiff's claims arise under section 14(d)(7) and (e) of the Exchange Act and SEC Rule 14d-10 promulgated thereunder. This Court has jurisdiction pursuant to 28 U.S.C. §1331, 15 U.S.C. §78aa, and section 27 of the Exchange Act. Defendants used the U.S. mail and the instrumentalities of interstate commerce.

14. The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, defendant Fresh Market's state of incorporation, and thus may be maintained in federal court. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

15. Venue is proper here pursuant to 28 U.S.C. §1391. Fresh Market is a Delaware corporation with a forum selection provision in its Bylaws that specifies that if all of the state courts of Delaware lack subject matter jurisdiction (as they do here, given the exclusive jurisdiction vested in the federal courts over the federal claims asserted herein), then the sole and exclusive

forum for certain legal actions involving the Company (including those for breach of fiduciary duty) shall be the federal district court for the District of Delaware.

## THE PARTIES

16.     Plaintiff is, and at all times relevant hereto was, a stockholder of Fresh Market, as set forth in the Certification attached hereto.

17.     Defendant Fresh Market is a Delaware corporation, headquartered in Greensboro, North Carolina.

18.     Defendant Apollo Global is a global alternative investment manager.

19.     Defendant Parent is a Delaware corporation.

20.     Defendant Merger Sub is a Delaware corporation and wholly-owned subsidiary of Parent.

21.     Defendant Management VIII manages certain funds that control Parent and Merger Sub.

22.     Defendant R. Berry is, and at all relevant times has been, a founder and the Chairman of Fresh Market, and is a member of the Board.  Defendant R. Berry is a party to the Rollover and Support Agreements.

23.     Defendant Rick Anicetti ("Anicetti") is, and at all relevant times has been, Fresh Market's President and Chief Executive Officer ("CEO"), and a member of the Board.

24.     Defendant Michael Casey is, and at all relevant times has been, a member of Fresh Market's Board.

25.     Defendant Jeffrey Naylor is, and at all relevant times has been, a member of Fresh Market's Board.

26.     Defendant Richard Noll is, and at all relevant times has been, a member of Fresh Market's Board.

27.     Defendant Bob Sasser is, and at all relevant times has been, a member of Fresh Market's Board.

28.     Defendant Robert Shearer is, and at all relevant times has been, a member of Fresh Market's Board.

29.     Defendant Michael Tucci is, and at all relevant times has been, a member of Fresh Market's Board.

30.     Defendant Steven Tanger is, and at all relevant times has been, a member of Fresh Market's Board.

31.     Defendant Jane Thompson is, and at all relevant times has been, a member of Fresh Market's Board.

32.     Defendant Brett Berry ("B. Berry") is the son of defendant R. Berry and was a former Vice Chairman, President, and CEO of Fresh Market.  Defendant B. Berry is a party to the Rollover and Support Agreements.

33.     The defendants named above in ¶¶22, 32 are sometimes collectively referred to herein as the "Rollover Defendants."

## THE PROPOSED ACQUISITION

**Background**

34.     Fresh Market is a specialty grocery retailer focused on creating an extraordinary food shopping experience for its customers.  The Company offers high-quality food products, with an emphasis on fresh, premium perishables and an uncompromising commitment to customer service.  The Company currently operates 186 stores in twenty-seven states across the U.S.

35.     Apollo is a leading global alternative investment manager with offices in New York, Los Angeles, Houston, Chicago, Bethesda, Toronto, London, Frankfurt, Madrid, Luxembourg, Mumbai, Delhi, Singapore, Hong Kong, and Shanghai.  Apollo had assets under management of approximately $170 billion as of December 31, 2015, in private equity, credit, and real estate funds invested across a core group of nine industries where Apollo has considerable knowledge and resources.

**Defendant R. Berry Explores Taking Fresh Market Private**

36.     On September 1, 2015, Fresh Market announced that it had named defendant Anicetti as the Company's President and CEO, and that defendant Anicetti had also been named to the Board.  At least a month prior to that announcement, defendant R. Berry, without the Board's knowledge, approached Apollo about taking Fresh Market private.  The first the Board learned of these conversations was on October 1, 2015, when the Board received an unsolicited proposal from Management VIII to acquire the Company for $30 per share.  Management VIII's proposal indicated it had discussed with defendants R. Berry and B. Berry the opportunity to rollover their Company shares in a transaction with Management VIII.

37.     At its October 15, 2015 meeting, the Board decided to create a committee (the "Strategic Transaction Committee") that would be responsible for reviewing and evaluating communications from stockholders and other third parties and reviewing and evaluating, and making recommendations to the Board with respect to, Management VIII's proposal and any other proposals from third parties.

38.     On October 16, 2015, *Reuters* reported that:

Fresh Market Inc. (TFM.O) founder and board chairman ***Ray Berry is exploring a bid to take the U.S. specialty grocery retailer private*** with the help of a private equity firm, according to people familiar with the matter.

Berry, who has a 4.1 percent stake in the company, *has reached out to several buyout firms*, seeking a private equity partner in order to put together an offer for Fresh Market, the people said this week.

*Private equity firm Apollo Global Management LLC (APO.N) has already agreed to work with Berry o*n the potential offer for Fresh Market, the people said.

39.     Even though the Board had just hired a new President and CEO that was working on a strategic plan, the *Reuters* announcement forced the Board's hand.  On October 19, 2015, the Board concluded that it had to issue a press release announcing the commencement of a review of its strategic and financial alternatives (code for exploring a sale).  That press release was issued on October 20, 2015.

40.     On October 20, 2015, following the issuance of the Company's press release, *Bloomberg* reported that *defendant B. Berry was considering taking Fresh Market private and had "turned to Apollo Global Management for help*."

41.     On October 21, 2015, Management VIII withdrew its October 1, 2015 proposal to acquire Fresh Market.

**The Process Leading to the Proposed Acquisition**

42.     A month later, on November 25, 2015, Management VIII reaffirmed its prior preliminary non-binding indication of interest to acquire Fresh Market in an all-cash transaction for $30 per share.  Management VIII stated that it was making the proposal together with defendants R. Berry and B. Berry.

43.     After receiving the November 25th letter from Management VIII, the Board's counsel contacted defendant R. Berry's counsel to determine if Management VIII's proposal accurately reflected any arrangement between Management VIII and the Berrys.  Defendant R. Berry's counsel said that he would consult with him and get back to the Board.

44.     On November 28, 2015, defendant R. Berry's counsel contacted the Board's counsel, and stated that since Management VIII's earlier offer had expired on October 20, 2015, defendant

R. Berry had engaged in one conversation with Management VIII, and during that conversation he had agreed that he would roll his equity interest over into the surviving entity if Management VIII were to be successful in agreeing to a transaction with Fresh Market.  Defendant R. Berry's counsel also stated that in the event that another buyer were to acquire Fresh Market, he would also consider rolling his equity interest over in such a transaction.

45.     At no time in the two months prior to December 3, 2015, did the Board ever direct defendant R. Berry to stop communicating with Management VIII or any other potential acquirer about a potential rollover of his Fresh Market equity.

46.     On December 3, 2015, the Board's counsel contacted defendant R. Berry's counsel to confirm: (i) that defendant R. Berry continued to be willing to discuss an equity rollover with any potentially interested party that the Board selected as a winning bidder; (ii) that defendant R. Berry would agree not to engage in any discussions regarding an equity rollover with any potentially interested party, including Management VIII, until authorized to do so by Fresh Market; and

(iii) that J.P. Morgan be able to confirm to all potentially interested parties this framework, and that no participants in the process would be permitted to speak with defendant R. Berry regarding these matters until authorized by Fresh Market.

47.     On January 12, 2016, as directed by the Strategic Transaction Committee, J.P. Morgan made available to all potential counterparties who had executed confidentiality agreements

a process letter establishing January 25, 2016, as the deadline to submit such indications of interest. The process letter informed potential counterparties that defendant R. Berry had informed Fresh Market that he would be open to having discussions regarding a potential rollover of his existing equity interests in Fresh Market with parties that advance sufficiently towards completion of the process, provided that at the time such discussions were authorized by Fresh Market.

48.     On January 25, 2016, Management VIII submitted a preliminary non-binding indication of interest proposing to acquire Fresh Market in an all-cash transaction at price of $31.25 per share.

49.     On February 18, 2016, the Strategic Transaction Committee determined that rollover discussions should be permitted only after final bids had been received and ***the Board had determined that it would proceed with a potential sale transaction and had agreed on price and other material transaction terms with the winning bidder***.

50.     On March 8, 2016, Management VIII submitted a definitive proposal to acquire Fresh Market in an all-cash transaction for the dramatically lower price of $27.25 per share (from its January 25 offer of $31.25 per share) of Fresh Market common stock. Management VIII's March 8th proposal was not contingent on an equity rollover by defendant R. Berry or any other member of the Berry family, but Management VIII had indicated to J.P. Morgan that they would prefer it if they could start discussing an equity rollover prior to announcement of a transaction.

51.     On the same day, the Strategic Transaction Committee determined that a price of $27.25 was not sufficient to move forward with Management VIII, and it would only consider allowing Management VIII to engage in discussions with defendant R. Berry and other members

of the Berry family regarding a potential equity rollover if Management VIII sufficiently improved its offer.

52.     On March 9, 2016, Management VIII submitted its final offer to acquire Fresh Market in an all-cash transaction for $28.50 per share of Fresh Market common stock.  On the same day, Management VIII reiterated its interest in speaking with members of the Berry family regarding a potential equity rollover.  Later that morning, the Strategic Transaction Committee determined Management VIII could engage in discussions with defendant R. Berry and other members of the Berry family regarding a potential equity rollover and that all such discussions would be chaperoned by J.P. Morgan and no specific price details would be shared.  Introductory conversations between defendants R. Berry and B. Berry occurred with representatives of Management VIII, with J.P. Morgan present, that evening.

53.     On March 10, 2016, the Board's counsel received a draft of a rollover, contribution, and exchange agreement and a draft support agreement from Apollo's counsel in connection with the Berry family potential rollover of their Fresh Market shares in the transaction.

54.     On March 11, 2016, the Board agreed to sell the Company to Apollo for the meager and dramatically (almost 9%) lower price (from Management VIII's January 25 offer of $31.25 per share) of $28.50 per Fresh Market share, and granted permission to Management VIII to engage in negotiations with defendants R. Berry and B. Berry regarding a potential rollover of their existing shares of Fresh Market common stock.

### THE PROPOSED ACQUISITION IS ANNOUNCED

55.     Fresh Market and Apollo announced on March 14, 2016, that they had entered into the Merger Agreement.  The press release containing the announcement states, in pertinent part:

**The Fresh Market Agrees to be Acquired by Funds Managed
by Affiliates of Apollo Global Management for $28.50 Per Share in Cash**

**Transaction Provides a Significant Premium to The Fresh Market
Stockholders and a Strong Partner to Support the
Company's Future Growth**

...The Fresh Market, Inc. The Fresh Market" or the "Company"), a growing specialty grocery retailer, and an affiliate of Apollo Global Management, LLC (together with its consolidated subsidiaries, "Apollo") today announced that they have entered into a definitive agreement (the "Merger Agreement") whereby certain funds managed by Apollo, a leading global alternative investment manager, will acquire The Fresh Market for approximately $1.36 billion.

The $28.50 per share all-cash offer by the Apollo Funds represents a premium of approximately 24% over The Fresh Market's closing share price on March 11, 2016, and a premium of approximately 53% over the February 10, 2016 closing share price, the day prior to press speculation regarding a potential transaction.

The announcement follows an open and thorough review of strategic alternatives undertaken by The Fresh Market Board of Directors to maximize stockholder value. The transaction will be implemented through a cash tender offer at $28.50 per share. The transaction was unanimously approved by the Board of Directors of The Fresh Market, other than Ray Berry, Chairman and Founder of The Fresh Market, who recused himself from all Board discussions related to the review and from the Board vote approving the transaction. Ray Berry and Brett Berry, who collectively own approximately 9.8% of The Fresh Market's outstanding shares, have agreed not to tender shares held by them into the tender offer and will both participate and rollover the vast majority of their holdings in the transaction with Apollo. In addition, George Golleher, with whom Apollo has had a long-term operating partner consulting relationship and who was formerly Chief Executive Officer of Smart & Final and Ralphs Grocery Company/Food-4-Less during ownership by other Apollo affiliated funds, will be a co-investor with the Apollo funds in the transaction.

"We are pleased to have reached this agreement with Apollo, which follows a comprehensive review of strategic and financial alternatives that generated interest from numerous parties. After an open and thorough process, our Board concluded that this offer maximizes value for our stockholders," said Rich Noll, The Fresh Market's Lead Independent Director.

"We are excited about this transaction with Apollo, which recognizes the value of The Fresh Market's strong brand and significant growth prospects while providing stockholders with an immediate and substantial premium," said Rick Anicetti, The Fresh Market's President and Chief Executive Officer. "Apollo is a highly-regarded investor, bringing deep industry expertise and financial resources, and we look forward to working with them to build on our progress in achieving our strategic plan to deliver long-term profitable growth."

"We are delighted about this transaction with The Fresh Market, which was one of the early pioneers in small-box grocery, offering unique, delicious and healthy food with a keen focus on perishables," said Andrew S. Jhawar, Senior Partner and Head of the Retail and Consumer Group at Apollo.  "We believe there is a significant opportunity to enhance the brand, merchandise offering and price-value combination to make The Fresh Market a primary destination for food shoppers, while at the same time being committed to social responsibility through partnerships with local vendors and communities.  Our team at Apollo has had the tremendous fortune of having executed transactions in several consumables retailers and brands – such as Sprouts Farmers Market, Smart & Final, Hostess Brands and General Nutrition Centers, among others – that have undergone significant transformations under our strategic guidance and we intend to bring that experience to bear at The Fresh Market.  We look forward to partnering with Ray Berry, Brett Berry and George Golleher, and beginning our discussions with the executive management team and the over 13,000 team members at The Fresh Market so that we can assist the company in delivering the most inspiring and engaging food shopping experience in the industry with best-in-class customer service."

The transaction – which is expected to close in the second quarter of 2016 – is conditioned upon satisfaction of the minimum tender condition which requires that shares representing more than 50 percent of the Company's common shares (other than shares held by Ray and Brett Berry that are being rolled over) be tendered, the receipt of approval under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976 and other customary closing conditions.

Under the terms of the Merger Agreement, the Company may actively solicit alternative acquisition proposals during a 21-day period following the execution date of the definitive agreement, continuing until midnight on April 1, 2016.  There can be no assurances that this process will result in a superior proposal, and The Fresh Market does not intend to discuss any developments with regard to this process unless and until the Company's Board of Directors makes a decision with respect to any potential superior proposal.

The transaction has fully committed financing in place.  It will be financed primarily through the incurrence of $800 million in new senior secured notes and an equity contribution of approximately $525 million from funds managed by Apollo in addition to the equity rollover from the Berrys.  The Fresh Market will also enter into a new $100 million revolving credit facility concurrently with the closing of the merger.

J.P. Morgan Securities LLC is serving as the exclusive financial advisor to The Fresh Market, and Cravath, Swaine & Moore LLP and Richards, Layton & Finger, P.A. are serving as its legal advisors. Barclays, RBC Capital Markets, LLC, Jefferies and Macquarie Capital are serving as financial advisors to Apollo.  The debt financing is being committed to by Barclays, Royal Bank of Canada, Jefferies Finance and Macquarie, and Davis Polk & Wardwell LLP is serving as their legal

counsel.  Morgan, Lewis & Bockius LLP and Morris, Nichols, Arsht & Tunnell LLP are acting as legal advisors to Apollo and Paul, Weiss, Rifkind, Wharton & Garrison LLP is acting as legal advisor to Apollo as it relates to the debt financing.

56.     On the same day following the announcement of the Merger Agreement, *Bloomberg* published an article about how in acquiring Fresh Market, Apollo, a financial buyer, had outmaneuvered The Kroger Company ("Kroger"), a strategic buyer, that would enjoy synergies from such a transaction that Apollo would not.  The article, entitled "Apollo's Edge in the Fresh Market Auction," stated:

> Strategic buyers like ***Kroger can justify paying more because they're better able to extract cost savings***, so it's ***unusual for them to be outmaneuvered*** by buyout shops. In this case, the ***latter had an edge***.

> *Bloomberg News* reported in October that Fresh Market's founder and board chairman ***Ray Berry was considering taking the company private and had turned to Apollo for help***.  While a deal with Kroger could have included Kroger's own shares as a form of payment, Fresh Market would account for less than 4 percent of the larger company's earnings. That means even if the acquisition paid off, there's a chance it might not have done much for Kroger's stock price.

> ***Berry and his son own roughly 9.8 percent of Fresh Market and likely had a preference for a deal that would let them maintain an equity stake in order to directly benefit if the company flourished under a new owner's control***.  The chance to invest alongside Apollo, which made more than 10 times its investment in Sprouts Farmers Markets and 2.8 times its investment in Smart & Final, surely would have appealed.

> ***For Apollo, the Berry family's interest in rolling its stake (valued at about $133 million) helped plug a financing gap*** at a time that has been tricky for buyouts, and resulted in a transaction involving less debt. That may have made banks more willing to commit, since less leverage is a feature favored by the eventual holders of the notes backing the buyout.

**Conflicts Poisoned the Process Leading to the Proposed Acquisition**

57.     The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Fresh Market to Apollo on terms preferential to defendants and other Fresh Market insiders and to subvert the interests of Plaintiff and the other public stockholders of the Company.   The Proposed Acquisition is being driven by the Rollover

Defendants whom the Board allowed to enter into Rollover and Support Agreements with Apollo, that will allow the Rollover Defendants, but not the Company's public stockholders, to rollover their 9.8% Fresh Market equity interest into equity of Parent.  Thus, if the Tender Offer closes, the Rollover Defendants will benefit as Fresh Market likely flourishes under Apollo, while the Company's public stockholders will be stripped of their Fresh Market equity and denied that same opportunity in exchange for an inadequate and unfair price of just $28.50 in cash per share.

58.     The Board and Company management are also driving this deal.  If the Proposed Acquisition closes, the Board and Company management will receive over $31 million from the sale of their illiquid holdings and from special payments—not being made to ordinary stockholders—for currently unvested stock options, performance units, and restricted shares, all of *which shall, upon completion of the transaction, become fully vested and exercisable*, and for the Company's senior management, change-of-control payments.  For example, defendant and Board member Anicetti will receive over $9 million if the deal closes *for less than eight months service*.  Thus, Board members are conflicted and serving their own financial interests rather than those of Fresh Market's other stockholders.

59.     The Board also selected a conflicted financial advisor, J.P. Morgan.  The Board has agreed to pay J.P. Morgan a fee of approximately $15 million, $2 million of which was payable upon the delivery by J.P. Morgan of its opinion, and *the remainder of which is wholly contingent upon the consummation of the Proposed Acquisition.*  Moreover, during the two-year period up to January 31, 2016, *the aggregate fees received by J.P. Morgan from Apollo were $116,780,392* (compared to fees received from Fresh Market during the same period of $204,372).

**These Unresolved and Unaddressed Conflicts Led to an Unfair Process**

60.     As set forth above, throughout the process, defendants favored the interests of Apollo, the Rollover Defendants, and the Board and Company management, over the interests of Fresh Market's public stockholders.  Among other things, the Board: (i) failed for over two months, to direct defendant and Board Chairman R. Berry to stop talking with potential acquirers about taking the Company private and rolling over his Fresh Market equity; (ii) failed to take steps to address, when they learned of it, defendant R. Berry's disloyalty in going behind the Board's back to try and take the Company private; (iii) allowed to permit defendant R. Berry's disloyal efforts to rollover his equity (but not any of the equity of Fresh Market's public stockholders) to become an official part of the process to sell the Company, by informing all potential acquirors of defendant R.                                Berry's                                interest and willingness to rollover his Fresh Market equity in any transaction the Board might agree to; (iv) in the face of Apollo's March 8, 2016 admission, that significantly less available debt financing than previously believed was available and at a substantially higher cost, accepted Management VIII's unfair and inadequate offer of $28.50 per share, knowing that the only beneficiaries would be Apollo and the Rollover Defendants (whose equity Apollo needed to make the deal work); and (v) while knowing of J.P. Morgan's conflict (presented by the over $116 million in fees that it had received from Apollo in just the last two years), accepted J.P. Morgan's fairness analyses in approving the deal to sell Fresh Market to Apollo.

61.     Thus, the conflicted and unfair process benefited only Apollo, the Rollover Defendants, and the Board and Company management.  In approving such an unfair deal, the

Board handed Apollo and the Rollover Defendants Fresh Market for an unfair price, while breaching their duties to maximize the value to the Company's public stockholders.

**The Conflicted and Unfair Process Led to an Unfair Price**

62.     The conflicted and unfair process has resulted in the Proposed Acquisition price of $28.50 per share that is unfair and undervalues Fresh Market's standalone value and its value to Apollo.  The proposed deal price represents inadequate consideration, especially given the fifty-two week trading high of Fresh Market common stock $42.07 per share.  Moreover, one Wall Street analyst recently set a target price of $31 per share for Fresh Market common stock.

63.     More significantly, the primary reason that Management VIII gave for lowering its offer by almost 9% on March 8, 2016, was that Apollo found less financing available, and at a higher price, than it had anticipated, and as a result could not afford to pay Fresh Market stockholders what it had previously offered.  Rather than rejecting $28.50 as inadequate, the Board accepted that meager price to sell the Company, and allowed its Chairman and his family to benefit, all at the expense of Fresh Market's public stockholders.

64.     Furthermore, in its *Public Trading Multiples Analysis*, J.P. Morgan used a very small sample size in light of all the comparable companies available.  And over the past two years, Fresh Market traded above the $28.50 per share offer price, until Fresh Market provided the market with downward adjustments to its guidance.  But J.P. Morgan did no benchmarking to adjust the few sampled companies to the higher gross margins and the higher earnings before interest, taxes, depreciation, and amortization ("EBITDA") margins Fresh Market has reported until the last quarter of 2015.  This failure resulted in J.P. Morgan applying inappropriately low multiples to Fresh Market in its *Public Trading Multiples Analysis*, and consequently deriving an artificially depressed valuation range for Fresh Market.   Had J.P. Morgan properly benchmarked the

comparable companies, the valuation range would have been in the $30s per share. The other flaw in J.P. Morgan's *Public Trading Multiples Analysis* is that it included, which it should not have, Fresh Market's EBITDA and price to earnings ("P/E") multiples, resulting J.P. Morgan employing an EBITDA multiple reference range of 4.5x-8.0x for 2016E (estimated), and a P/E multiple reference range of reference range of 12.0x-20.0x for 2016E. In fact J.P. Morgan should have used an EBITDA multiple reference range of 7.2x-13.3x for 2016E and a P/E multiple reference range of 16.4x-28.7 for 2016E. This means that, had J.P. Morgan conducted its *Public Trading Multiples Analysis* correctly, the high end of the values it observed would have actually been at the low end of the value range derived from this analysis.

65. J.P. Morgan again used an inordinately small number of transactions—just five—in its *Selected Transaction Analysis*. J.P. Morgan went back ten years to select transactions and in that period there were perhaps ten times as many comparable transactions. Oddly, J.P. Morgan selected two transactions from 2006, and then skipped all the way to 2013 for the other three transactions it selected. And among the five transactions J.P. Morgan selected was Kroger's November 2015 acquisition of Roundy's Supermarkets, Inc. ("Roundy's"), in which transaction J.P. Morgan served as Roundy's financial advisor. In the Roundy's Solicitation/Recommendation Statement on Schedule 14D-9 for the Kroger deal, J.P. Morgan reported that **it had selected twenty-four transactions** that it used in its *Selected Transactions Analysis* of Roundy's.

66. From its *Selected Transaction Analysis* here, J.P. Morgan derived per share value ranges of $28.75 to $36.50 based on Firm Value/2015 Projected EBITDA, and per share values ranges of $27.00 to $34.25 based on Firm Value/2016 Estimated EBITDA. Clearly this analysis supports a much higher per share price than the $28.50 per share offer price. But J.P. Morgan

failed to disclose the multiples for each of these transactions, and so it is unclear how it selected 7x-9x trailing EBITDA to apply to Fresh Market's 2015 Projected and 2016 Estimated EBITDA. If the range of transaction multiples is 9x to 11x, and the average is 10x, then the implied share equity ranges would have been much higher than J.P. Morgan derived.

67.     In its *Discounted Cash Flow Analysis*, J.P. Morgan conducted four illustrative discounted cash flow analyses using four sets of projections provided by Fresh Market's management, from which J.P. Morgan derived the following per share value ranges:

|  | November 17 Management Case | Comparable Growth Scenario | Gross Margin Scenario | Comparable Growth Scenario and Gross Margin Scenario |
|---|---|---|---|---|
| High | $ 42.25 | $ 32.75 | $ 32.00 | $ 26.00 |
| Low | $ 33.75 | $ 26.25 | $ 25.50 | $ 21.00 |

68.     First, the November 17 Management Case (developed by Fresh Market's management as part of the development of management's strategic plan and in connection with Fresh Market's review of strategic and financial alternatives) results in a value range well above the Tender Offer price.   Both the Comparable Growth Scenario (an alternate version of the November 17 Management Case to sensitize the November 17 Management Case *for the possibility of lower revenue growth* over the projection period) and the Gross Margin Scenario (an alternate version of the November 17 Management Case to sensitize for *the possibility of lower gross margins* over the projection period) also results in per share value ranges that are largely and significantly higher than the Tender Offer price.   Finally, and inexplicably, the Comparable Growth and Gross Margin Scenario, combines the two scenarios to sensitize the November 17 Management Case *for the possibility of both lower revenue growth and lower gross margins* over the projection period.

69.     Second the cash flow conversion rate inexplicably drops from the Management Case (which stabilizes at 43% in the last five years of the projection) to 40% in the Comparable Growth and Gross Margin Scenarios.  In the last two years of the projections, the cash flow conversion rate falls to 36% without explanation.  Assumptions are being made (that are not disclosed in the limited information in the 14D-9) that are causing the cash flow conversion rate to be depressed, which results in the artificially low value ranges derived in the Comparable Growth, Gross Margin, and Comparable Growth and Gross Margin Scenarios.

70.     Third, the 9%-10% discount rate that J.P. Morgan employed in its *Discounted Cash Flow Analysis* is significantly lower than 6%-8% discount rates of the comparable companies that J.P. Morgan selected for its *Public Trading Multiples Analysis*.  Had J.P. Morgan used a 6%-8% discount rate, the unlevered free cash flows and the present value of those cash flows would have been higher, increasing the per share equity values derived from the *Discounted Cash Flow Analysis*.

71.     Fourth, in a discounted cash flow analysis, terminal values can represent up to 90% of an entity's total value.  Here, J.P. Morgan used an implied EBITDA multiple in the final year of the analysis of just 5%.  Because J.P. Morgan used a much higher EBITDA range of 7-9% in its *Selected Transaction Analysis*, the terminal value J.P. Morgan applied in its *Discounted Cash Flow Analysis* is artificially low, suggesting that the projected cash conversion rate is too low or discount rate is too high.  The improper application of implied EBITDA multiple in the final year of the analysis of just 5% results in depressed equity value range derived from the *Discounted Cash Flow Analysis*.

**Preclusive Deal Protection Devices**

72.     To ensure Apollo, and only Apollo, acquires Fresh Market, defendants included several deal protection devices in the Merger Agreement.  Pursuant to the Merger Agreement, Merger Sub has commenced the Tender Offer.  The initial offer period of the Tender Offer will expire on April 21, 2016.  The closing of the merger is subject only to tender by the holders of a simple majority of the Company's common stock.  Fresh Market and Apollo have announced their intent to effect the merger, pursuant to section 251(h) of the Delaware General Corporation Law, as a short-form merger—to cash out any stockholders who do not tender—without so much as a stockholder vote.

73.     While the Merger Agreement permitted Fresh Market to shop itself until April 1, 2015, that illusory twenty-one-day "go-shop" period provision appears to be meaningless in light of the deal protection devices in the Merger Agreement.  Not surprisingly no alternate bidders stepped forward during the go-shop period.  The deal protection devices in the Merger Agreement will preclude a fair sales process for the Company and lock out competing bidders, and include: (i) a no-shop clause that will preclude the Company from soliciting potential competing bidders; (ii) a matching rights provision that would require the Company to disclose confidential information about competing bids to Apollo, and allow Apollo to match any competing proposal; and (iii) a termination and expense fee provision that would require the Company to pay Apollo $34 million if the Proposed Acquisition is terminated in favor of a superior proposal.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Fresh Market.

74.     The Tender Offer structure and the onerous and preclusive deal protection devices operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company.  In combination, the deal protection provisions in

the Merger Agreement, discussed above, effectively preclude any other potential bidders for consummating an offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for stockholders before agreeing to the Proposed Acquisition.

**The False and Misleading 14D-9**

75.     In order to encourage and obtain stockholder tenders in response to the Tender Offer, defendants filed and disseminated to stockholders the materially misleading 14D-9.  The 14D-9, which recommends that Fresh Market's stockholders tender their shares to Merger Sub, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company.   Specifically the 14D-9 omits/or misrepresents the material information set forth below in contravention of section 14(e) of the Exchange Act.

76.     ***The Board's decision to retain J.P. Morgan even though it had been paid over $116 million by Apollo over the last two years.***  Page 19 of the 14D-9 states that the Board's Strategic Transaction Committee determined to hire J.P. Morgan to serve as its financial advisor and, at page 45, that during the two-year period up to January 31, 2016, ***the aggregate fees received by J.P. Morgan from Apollo were $116,780,392*** (compared to fees received from Fresh Market during the same period of $204,372).  The 14D-9 fails to explain why the Board chose to hire J.P. Morgan as its one and only financial advisor.  Without this information, stockholders cannot reasonably consider whether the Board's financial advisor was conflicted in giving its fairness opinion.

77.     ***The individual estimated value ("EV")/2016 EBITDA and 2016E P/E multiples for each of the selected public companies, except for Kroger, analyzed by J.P. Morgan in its Selected Companies Analysis***.  In the description of J.P. Morgan's *Selected Companies Analysis*

on pages 40-45 of the 14D-9, defendants omit the individual EV/ 2016 EBITDA and 2016E P/E multiples for each of the selected public companies.  It is important to disclose the specific multiples of the varying companies to determine if the selections made by the financial advisor are representative of the company and the industry in which it operates.  This would be difficult, many times impossible, to infer from just looking at the low, high, mean, and median multiples.  Because the highs of each multiple range are over 100% larger when compared to the lows, it is impossible to determine if the ranges selected and applied by the advisor are appropriate.  Without the information set forth above, stockholders are also unable to independently assess whether the *Selected Companies Analysis* is an adequate measure of the value of comparable companies and in turn, what weight, if any, to place on the financial advisor's fairness opinion.

78.     ***Whether J.P. Morgan performed any benchmarking analysis for Fresh Market in its Selected Companies Analysis***.  In the description of J.P. Morgan's *Selected Companies Analysis* on pages 40-45 of the 14D-9, defendants omit to disclose whether J.P. Morgan performed any benchmarking analysis for Fresh Market in its *Selected Companies Analysis*.  A benchmarking analysis is very important as it provides context to the market analysis by the financial advisor.  For example, if a company's growth prospects are greater or less than the comparable companies metrics, that would influence whether higher or lower valuation multiples are appropriate.  Without the information set forth above, stockholders are unable to assess whether the analysis was performed properly, and in turn, what weight, if any, to place on J.P. Morgan's fairness opinion.

79.     ***The individual EV/Last Twelve Months ("LTM") EBITDA multiples for each of the selected precedent transactions analyzed by J.P. Morgan in its Selected Precedent Transactions Analysis***.  In the description of J.P. Morgan's *Selected Precedent Transactions Analysis* on page 43 of the 14D-9, defendants omit the individual EV/LTM EBITDA multiples

for each of the selected precedent transactions.  It is important to disclose the specific multiples of the varying transactions to demonstrate if the selections made are representative of the company and the industry in which it operates.  As no multiples were disclosed, it is impossible to determine if

the range selected and applied by the advisor is appropriate.  Even in the same industry, transaction multiples can vary over time, making disclosures of individual multiples imperative.  Without the information set forth above, stockholders are also unable to independently assess whether the *Selected Precedent Transactions Analysis* is an adequate measure of the value of the selected precedent transactions and in turn, what weight, if any, to place on the financial advisor's fairness opinion.

80.     ***The implied terminal EBITDA multiple range for each of the four scenarios resulting from J.P. Morgan's Discounted Cash Flow Analysis***.  In the description of J.P. Morgan's *Discounted Cash Flow Analysis* on page 44 of the 14D-9, defendants omit the implied terminal EBITDA multiple range for each of the four scenarios resulting from this analysis.  This disclosure is important as it represents a "sanity check" on the other inputs.  Implied terminal EBITDA multiples can shed light on whether valuation inputs result in values that are consistent with market realities.  Without the information set forth above, stockholders are also unable to independently assess whether the *Discounted Cash Flow Analysis* is an adequate measure of Fresh Market's inherent value, and in turn, what weight, if any, to place on the J.P. Morgan's fairness opinion.

81.     ***The financial projections for each of the four certain Fresh Market scenarios (November 17 Management Case, Comparable Growth Scenario, Gross Margin Scenario and Comparable Growth and Gross Margin Scenario) provided by Fresh Market management and***

***relied upon by J.P. Morgan for purposes of its analysis, for fiscal years 2016-2025, for EBIT (or D&A), Taxes (or tax rate), Capital expenditures, Changes in net working capital, Stock-based compensation expense, and any other adjustments to unlevered free cash flow, as well as the rationale for making the three different sensitivity projections disclosed.*** On pages 46-50, the 14D-9 sets forth some information about the four Fresh Market scenarios that J.P. Morgan relied upon for purposes of its analysis for fiscal years 2016-2025. The 14D-9 omits, however, in each of the four scenarios, financial projections for EBIT (or D&A), Taxes (or tax rate), Capital expenditures, Changes in net working capital, Stock-based compensation expense, and any other adjustments to unlevered free cash flow, as well as the rationale for making the three different sensitivity projections disclosed. It is important to disclose these projection items used to build up to the disclosed cash flows. Cash flow forecasts are a function of several elements. Understanding these elements is critical to understanding whether the resulting cash flow forecast reflects a reasonable estimate of future financial performance. Without the information set forth above, what weight, if any, to place on the J.P. Morgan's fairness opinion.

82. Defendants were aware of their duty to disclose the foregoing material information in the 14D-9, and acted with that knowledge in failing to ensure that this material information was disclosed in the 14D-9. Absent disclosure of this material information, stockholders are unable to make an informed decision about whether to tender their shares or seek appraisal, and are thus threatened with irreparable harm.

83. In essence, the Proposed Acquisition is the product of a hopelessly flawed process that was designed to ensure the merger of Fresh Market with Apollo on terms preferential to Apollo and defendants, and detrimental to Plaintiff and Fresh Market's stockholders. In agreeing to the Proposed Acquisition, each of the defendants has breached their fiduciary duties of loyalty, due

care, independence, candor, good faith, and fair dealing, and/or has aided and abetted such breaches.  By providing the Rollover Defendants with differential consideration, defendants are violating section 14(d)(7) of the Exchange Act.  In disseminating a materially false and misleading 14D-9, the Individual Defendants and Fresh Market are violating section 14(e) of the Exchange Act.

84.    Defendants are moving quickly to consummate the Proposed Acquisition. ***According to the defendants, the Tender Offer will expire on April 21, 2016***.  Moreover, the deal protection devices operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Fresh Market.  Consequently, immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

85.    Plaintiff seeks to enjoin the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action on his own behalf and on behalf of a Class of all the public stockholders of Fresh Market (the "Class").  Excluded from the Class are the defendants and any directors or officers of Fresh Market as well as the members of their immediate families, and any entity in which any of them has a controlling interest, and the legal representatives, heirs, successors or assigns, or any such excluded party.

87.    The members of the Class are so numerous that joinder of all members is impractical.

88.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class are being injured or legally damaged as a result of defendants' wrongful conduct.  Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by members of the Class may be relatively small, albeit significant, the expense and burden of individual litigation makes it virtually impossible for Plaintiff and members of the Class individually to seek redress for the conduct alleged.  Plaintiff knows of no difficulty to be encountered in the management of this action which would preclude its maintenance as a class action.  Relief concerning Plaintiff's rights under the laws involved herein and with respect to the Class as a whole would be appropriate.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are: (i) whether defendants violated the federal securities laws as alleged in this Complaint, including violating and/or participating in a scheme to violate section 14(d)(7) of the Exchange Act and/or SEC Rule 14d-10 promulgated thereunder; (ii) whether the Rollover Defendants are being offered consideration pursuant to the Tender Offer which is higher than that received by other Fresh Market stockholders; (iii) whether defendants have varied the terms of the Tender Offer as to the Rollover Defendants prior to the expiration of the Tender Offer to pay them higher consideration; and (iv) whether the members of the Class have sustained damages, and if so, the proper measure of such damages.

**DEFENDANTS' FIDUCIARY DUTIES**

91.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's stockholders, and if such transaction will result in a

change of corporate control, the stockholders are entitled to receive a significant premium. To diligently comply with these duties, the directors may not take any action that:

     (a)     adversely affects the value provided to the corporation's stockholders;

     (b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

     (c)     contractually prohibits them from complying with their fiduciary duties;

     (d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; and/or

     (e)     will provide the directors with preferential treatment at the expense of, or separate from, the public stockholders.

92.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Fresh Market, are obligated to refrain from:

     (a)     participating in any transaction where the directors' or officers' loyalties are divided;

     (b)     participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

     (c)     unjustly enriching themselves at the expense or to the detriment of the public stockholders.

93.     Plaintiff alleges herein that defendants, separately and together, in connection with the Proposed Acquisition, violated and/or aided and abetted in the violation of fiduciary duties owed to Plaintiff and the other public stockholders of Fresh Market, including the duties of loyalty, good faith, candor, due care, and independence. As a result of these breaches of fiduciary duties

and the aiding and abetting therein, neither Plaintiff nor the Class will receive adequate or fair value for their Fresh Market common stock in the Proposed Acquisition.

94. Because defendants have breached their duties of due care, loyalty, and good faith in connection with the Proposed Acquisition, and/or have aided and abetted therein, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## COUNT I

### Claim for Breach of Fiduciary Duties and Aiding and Abetting Against All Defendants

95. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96. The Individual Defendants, aided and abetted by Fresh Market, Apollo Global, Parent, Merger Sub, Management VIII, and defendant B. Berry, have knowingly or recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public stockholders of Fresh Market and have acted to put their personal interests ahead of the interests of Fresh Market' stockholders.

97. By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive Plaintiff and the other members of the Class of the true value of their investment in Fresh Market.

98. The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Fresh Market' stockholders. Fresh Market, Apollo Global, Parent, Merger Sub, Management VIII, and defendant B. Berry aided and abetted the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the other holders of Fresh Market stock.

99.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly and in bad faith failed to exercise the care required, and breached their duties of loyalty, good faith, candor, and independence owed to the stockholders of Fresh Market because, among other reasons, they failed to ensure a fair process and maximization of stockholder value.

100.    Because the Individual Defendants dominate and control the business and corporate affairs of Fresh Market, and are in possession of private corporate information concerning Fresh Market's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Fresh Market which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

101.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have knowingly or recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

102.    As a result of the actions of defendants, Plaintiff and the Class have been and will be irreparably harmed.

103.    Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to Plaintiff and the other members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's terms, and will not supply to Fresh Market's stockholders sufficient information to enable them to make informed decisions regarding the tender of their shares in connection with the Proposed Acquisition, and may consummate the Proposed Acquisition, all to the irreparable

harm

of the members of the Class.

104.    Plaintiff and the other members of the Class have no adequate remedy at law.  Only

through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected

from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

**Claim for Violation of Section 14(e) of the Exchange Act
Against Fresh Market and the Individual Defendants**

105.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

106.    Section 14(e) of the Exchange Act requires full and complete disclosure in

connection with tender offers.  Specifically, section 14(e) provides that:

> It shall be unlawful for any person to make any untrue statement of a material fact
> or omit to state any material fact necessary in order to make the statements made,
> in the light of the circumstances under which they are made, not misleading, or to
> engage
> in any fraudulent, deceptive, or manipulative acts or practices, in connection with
> any tender offer or request or invitation for tenders, or any solicitation of security
> holders in opposition to or in favor of any such offer, request, or invitation.  The
> Commission shall, for the purposes of this subsection, by rules and regulations
> define, and prescribe means reasonably designed to prevent, such acts and practices
> as are fraudulent, deceptive, or manipulative.

107.    The Individual Defendants violated section 14(e) of the Exchange Act by making

untrue statements of material fact in the 14D-9 and by failing to state material facts necessary in

order to make the statements made in the 14D-9 in the light of the circumstances under which they

were made, not misleading.

108.    None of the Individual Defendants made a reasonable investigation or possessed

reasonable grounds for the belief that the statements made in 14D-9 were true, without omissions

of any material facts, and not misleading, and knew that the statements made therein were false and misleading or acted in reckless disregard for the truth.

109.    The 14D-9 was prepared, reviewed, and/or disseminated by Fresh Market and the Individual Defendants.  The Individual Defendants, as directors and/or officers of Fresh Market, allowed their names to be used in the 14D-9.  The use of their names was not incidental, but rather material in connection with the recommendation that stockholders accept the Tender Offer

and tender their shares to Apollo.  The use of their names lent substantial and material support to the recommendations.

110.    By reason of the foregoing, the Individual Defendants and Fresh Market have violated section 14(e) of the Exchange Act.  Because of the false and misleading statements in the 14D-9, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is prevented.

## COUNT III

**Claim for Violation of Section 14(d)(7) of the Exchange Act Against All Defendants**

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    As part of the Tender Offer, Apollo has agreed to pay certain Fresh Market insiders additional consideration in an undisclosed amount that Apollo has not offered to pay to Fresh Market's other stockholders.  Specifically, Apollo has entered into Support and Rollover Agreements with Rollover Defendants R. Berry, Fresh Market's founder and Chairman of Fresh Market's Board, and B. Berry, R. Berry's son and a former Vice Chairman, President, and CEO of

Fresh Market.  These Rollover and Support Agreements provide that the Rollover Defendants will support the transactions contemplated by the Merger Agreement but not tender their shares to Apollo.  Instead, the Rollover Defendants will exchange the vast majority of their shares for equity securities of Parent.  The precise value and terms of this consideration is undisclosed, but it will involve investment of the Rollover Defendants' equity interests, which amount to approximately 9.8% of the Company's outstanding shares, into Parent on the expectation that the value of the investment will increase over time.

113.    The additional and different consideration being paid by Apollo to the Rollover Defendants is an integral part of the Tender Offer and is being paid as consideration in return for the Rollover Defendants' endorsement and/or their agreement to cooperate with Apollo in consummating the Tender Offer.

114.    Apollo's improper agreement with the Rollover Defendants violates the anti-discrimination provision, or "all holders—best price" rule, of section 14(d)(7) of the Exchange Act and SEC Rule 14d-10 promulgated thereunder.  The Support and Rollover Agreements with the Rollover Defendants were negotiated at the very time defendants were negotiating the Merger Agreement, are being honored by Apollo as part of the Merger Agreement and will become effective only upon the successful consummation of the Acquisition.

115.    Plaintiff and the members of the Class have been and will be irreparably harmed by defendants violations' of section 14(d)(7) of the Exchange Act, and accordingly seek to enjoin these violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for stockholders;

C.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Fresh Market stockholders and to refrain from entering into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

D.     Declaring that defendants violated the federal securities laws as alleged herein by offering to by disseminating the 14D-9 in connection with the Tender Offer that contains materially false and misleading information about the Tender Offer;

E.     Declaring that defendants violated the federal securities laws as alleged herein by offering to pay and paying the Rollover Defendants different and more valuable consideration in connection with the Tender Offer beyond that paid to Plaintiff and members of the Class;

F.     Awarding Plaintiff and the members of the Class compensatory damages in an amount which may be proven at trial, together with interest thereon;

G.     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

H.     Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to

attach, impound, or otherwise restrict the defendants' assets to assure Plaintiff has an effective remedy.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 8, 2016                    **COOCH AND TAYLOR, P.A.**

                                       s/*Blake A. Bennett*
                                       Blake A. Bennett (#5133)
                                       The Brandywine Building
                                       1000 West Street, 10th Floor
                                       Wilmington, DE 19899
                                       Telephone: (302) 984-3889
                                       Facsimile: (302) 984-3939
                                       E-mail: bbennett@coochtaylor.com

                                       ROBBINS ARROYO LLP
                                       BRIAN J. ROBBINS
                                       STEPHEN J. ODDO
                                       600 B Street, Suite 1900
                                       San Diego, CA 92101
                                       Telephone: (619) 525-3990
                                       Facsimile: (619) 525-3991
                                       E-mail: brobbins@robbinsarroyo.com
                                                   soddo@robbinsarroyo.com

                                       *Attorneys for Plaintiff*

1092878